UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

99 OCT 13 AM 11: 20

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| ANTHONY LONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-95-S-2808-NE |
| | ) | |
| RTM ALABAMA, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | ENTERED |
| EZELL WILLIAMS, | ) | |
| | ) | OCT 1 3 1998 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-96-C-2171-NE |
| | ) | |
| RTM ALABAMA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

Plaintiffs Anthony Long and Ezell Williams claim they were subjected to discrimination by their employer, defendant RTM Alabama, Inc., because of their race, African-American. They seek damages pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e *et seq.*, and 42 U.S.C. § 1981.[1] These consolidated cases presently are before this court on defendant's motions for summary judgment and plaintiffs' motion for sanctions. Upon consideration of the pleadings, briefs, and evidentiary submissions, this court

---

[1] Plaintiffs' complaints also allege violations of the Equal Pay Act and 42 U.S.C. § 1983. Those claims are patently frivolous, and are due to be dismissed: the Equal Pay Act only prohibits gender-based wage discrimination; and 42 U.S.C. § 1983 only prohibits violations of civil rights by persons acting under color of state law. Plaintiffs only allege race-based discrimination, and there is absolutely no evidence that defendant is a state actor.

concludes the motions for summary judgment are due to be granted in part and denied in part, and the motion for sanctions is due to be denied.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ..."   Rule 56(c), Fed. R. Civ. P.   The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991).   The moving party discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-moving party's case.  *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995)(*per curiam*).  Rule 56 permits the movant to discharge this burden with or without supporting affidavits.  *Celotex*, 477 U.S. at 324, 106 S.Ct. 2553.  When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial.  *Jeffery*, 64 F.3d at 593.

2

In deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury

3

or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251-52, 106 S.Ct. at 2512.

With the foregoing standards in mind, this court now will summarize the undisputed facts, or, if disputed, shall state them in a manner most favorable to the non-moving parties, plaintiffs Anthony Long and Ezell Williams.

## II. FACTS

### A.   Anthony Long

RTM Alabama, Inc. ("RTM") operates a "chain" of Arby's restaurants in Alabama. (Barton affidavit ¶ 2.) Plaintiff Anthony Long was hired as a "team member" at one of RTM's stores in Huntsville, Alabama on July 1, 1991. RTM promoted Long to the position of assistant manager on October 5, 1992, and paid him an annual salary of $17,500. (*Id.*) Long received a salary increase to $18,500 on May 13, 1993, but voluntarily resigned his employment with RTM on October 18, 1993. (*Id.* ¶ 8.)

Anthony Long reapplied for employment with RTM, and he was rehired as a "team leader" at an hourly wage of $5.75 on May 30, 1994. (*Id.*)   Long was promoted to assistant manager on June 18, 1994, with an attendant annual salary of $20,000. (*Id.*)   He received a raise to $21,500 on May 29, 1995. (*Id.*)

RTM's Director of Operations, Eric Anderson, called Long on July 6, 1995, to inquire whether he would be interested in moving to Birmingham, Alabama to work under Anderson's supervision. (Long

4

deposition at 349-50.) Long replied that he was unwilling to move unless a manager's position was available. (Id.) Anderson stated that no such positions were available, but promised to contact Long when a manager's position became vacant. (Id.) Thereafter, Anderson called Long on several occasions to offer managerial positions in Birmingham, but Long declined each of the offers.[2] (Id.)

Anthony Long contacted RTM's Vice President of Operations, Adam George, on July 7, 1995, to complain about an altercation with RTM's area supervisor, Tracey Butler.[3] (Long deposition at 75-76, 86.) George encouraged Long to personally resolve the issue with Butler, and to contact George if he was unable to do so. (Id.) Long met with Butler for several hours on the evening of July 7, 1995; two days later, on July 9, 1995, Long advised Adam George on July 9, 1995 that "everything had been taken care of." (Id. at 342.) The following day, however, Long notified George of his intent to file an internal complaint involving the altercation with Tracey Butler. (Id. at 106-07.) Thus, George traveled to Huntsville on July 11, 1995, to conduct an investigation of Long's complaint. Long refused to cooperate in that investigation, however. (Id. at 115-16.) Instead, he filed a charge of discrimination with the Equal Employment Opportunity Commission on

_____

[2] Long contends Anderson offered those positions to induce Long to settle the present action.

[3] The area supervisor is responsible for oversight and management of several RTM restaurants in North Alabama. (George affidavit ¶ 4.)

5

July 14, 1995. (*Id.* at 144-45.) After receiving a notice of right to sue, Long filed the present action.

**B.   Ezell Williams**

    **1.   Hiring**

Plaintiff Ezell Williams contacted RTM in response to an advertisement in the Huntsville *Times* newspaper. Williams spoke by telephone with Tracey Butler, who initially stated that RTM was not hiring, but looking to see "what's out there." (Williams deposition at 67.) Butler interviewed Williams, but telephoned him two weeks thereafter to state that no positions were available. (*Id.* at 86-87.) In that same conversation, Williams reiterated his interest in employment with RTM; therefore, Tracey Butler arranged an interview for Williams with Adam George, RTM's Vice President of Operations. (*Id.* at 58, 88; George deposition at 13-14.)

George interviewed Williams on August 5, 1998, and determined that Williams was a promising candidate for an assistant manager position. (Williams deposition at 59; George affidavit ¶ 2.) Tracey Butler offered Williams an assistant manager position, and Williams accepted on August 18, 1995. (Williams deposition at 719.)

    **2.   Salary**

Williams' initial annual salary was $25,000 (George ¶¶ 2, 6), which was near the upper end of the salary range for RTM assistant managers: *i.e.*, from $18,000 to $26,000 a year. (George

6

deposition at 64-65.)   Indeed, on his date of hire, Williams was paid more than most of RTM's thirteen assistant managers; only five earned more than he.   Moreover, only one of those five (white assistant manager Bill Neeley) was hired at a salary greater than the beginning amount paid Williams.   (George affidavit ¶ 6.) Neeley was hired at a greater salary, however, because he possessed eight years of experience in the restaurant industry, including seven years of managerial experience, whereas Williams did not possess such qualifications.   (Id.)  By February of 1996, Williams was paid more than any other assistant manger in RTM's North Alabama division, except for Wilbur Cooper, who is also an African-American male.   (Id. ¶ 7.)

Williams attempts to compare himself to another RTM employee: Gary Steelman.   Steelman was paid more than Williams, because he was hired into RTM's "fast track" program.   (Id. ¶ 8, 15.) Employees hired into that program are expected to become area supervisors or vice-presidents for RTM within 12 to 36 months. (Id. ¶ 1.)   Steelman possessed no experience in the restaurant industry, but was nevertheless considered eligible for the "fast track" program because he previously had managed a multi-unit sales operation.   (Id.)   Multi-unit experience was a requirement for eligibility in the "fast track" program, and Williams lacked any such experience.   (Id.)

7

### 3. Harassment

Upon commencement of employment with RTM, Williams began a five week training program under the supervision of training manager Steve Middlebrooks. (George deposition at 51-52.) During his third week of work, Williams injured his knee on-the-job, and requested workers' compensation benefits. (Williams deposition at 477.) Middlebrooks allegedly became hostile towards Williams after the injury. (*Id.* at 475.) Specifically, Williams claims, Middlebrooks called him "bubba" on one occasion, and "brother" on another occasion. (*Id.* at 291.) Middlebrooks also made Williams clean baseboards and work awkward hours, while reducing the number of staff workers on Williams' shifts. (*Id.* 129, 516-518.) Finally, Middlebrooks ceased training Williams. Even so, other employees, including white assistant manager Angie Edmiston, also were subjected to such behavior. (*Id.* at 382, 773.)

Middlebrooks allegedly grabbed Williams' arm on October 20, 1995, and Williams immediately telephoned complaints to the offices of area supervisor, Shelly Racer, Director of Operations, Kevin Moore, and Vice President of Operations, Adam George. (*Id.* at 519.) George returned Williams' call within ten minutes. (*Id.* at 520-21.) Williams met with Kevin Moore on October 22, 1995, and Shelly Racer and Steve Middlebrooks joined that discussion later. (*Id.* at 521-22.) Thereafter, Adam George, Kevin Moore, and Shelly

8

Racer commenced an investigation, but could not confirm Williams'
allegations. (George affidavit ¶ 10.)

Nevertheless, George counseled Middlebrooks that RTM policy
prohibited touching other employees. (George deposition at 232.)
George also revoked Middlebrooks' manager status, training unit
certification, and operating partner eligibility until June of
1997. (*Id.* at 230.) Finally, George transferred Williams to a
different store under the management of an African-American female,
Gwen Jones (George affidavit ¶ 10.) Shelly Racer became
responsible for completing Williams' training. (*Id.*)

## 4. Retaliation and resignation

Williams resigned on May 20, 1996. (Williams deposition at
147.) Williams points to nine allegedly retaliatory events that
supposedly prompted his resignation:

1.  Adam George issued a written reprimand and warning to
    Williams for a lack of honesty, because Williams
    allegedly denied, but later admitted telling an
    inappropriate joke to other employees. (Williams
    deposition at 576.) Williams maintains that he did not
    tell an inappropriate joke. (*Id.* at 573-75.)

2.  RTM supervisors refused to certify that Williams
    completed an "Advanced Management Document Program,"
    allegedly resulting in a loss of future opportunities for
    promotion.[4] (*Id.* at 309-10.)

---

[4] Williams testified that the certification was required "in order to be,
I guess, eligible to go be promoted or something, is what they explained to me."
(Williams deposition at 309-10.) He presents no evidence that he actually lost
a promotional opportunity as a result of the alleged failure to grant his
certification, however.

9

3.  RTM delayed payment of COBRA reimbursements.[5] (*Id.* at 419-20.)

4.  Shelley Rader attempted to find fault with Williams' performance on every occasion that she visited his restaurant. (*Id.* at 332-33.)

5.  Adam George complained about Williams' tardiness for work on a particular date. Williams claims that he arrived in a timely fashion. (*Id.* at 337-39, 344, 365.)

6.  Shelley Rader failed to travel to Huntsville "several times" to complete Williams' training. (*Id.* at 413.)

7.  RTM management questioned Williams about fliers discussing RTM in a derogatory manner. (Williams deposition at 555-56.) Even so, Adam George also questioned other employees about the fliers. (George affidavit ¶ 14.)

8.  Williams asserts that RTM conducted spot evaluations of his restaurant (Williams deposition at 56), but he presents no evidence to refute RTM's contention that RTM conducted spot checks and evaluations of all assistant managers. (George affidavit ¶ 14.)

9.  Williams believed that RTM posted its grievance procedures in retaliation for Williams' conduct. (Williams deposition at 620.) RTM posted grievance procedures in all of its restaurants, however. (George affidavit ¶ 14.)

Williams testified that none of those actions were motivated by racial discrimination. (*Id.* at 310, 332, 338, 414, 419, 554-56, 620.) Rather, he perceived each action to be in retaliation for his complaints about Middlebrooks. (*Id.*)

Each of those alleged acts of retaliation occurred prior to April 3, 1996. (Williams deposition at 630.) Williams resigned

---

[5] This court has reviewed the pages of Williams' deposition transcript cited in support of this allegation. They do not establish the basis for RTM's obligation to make certain COBRA reimbursements to Williams. Even so, Williams' testimony establishes that RTM was responsible for making some form of payment, but allegedly delayed that payment after Williams' complaints.

10

his employment with RTM on May 20, 1996. The only alleged act of retaliation between April 3 and May 20, 1996 was RTM's failure to award Williams a raise. (*Id.* at 368.) Raises did not become effective until June of 1996, however. (George affidavit ¶ 13.) Williams would have received the raise if he had not resigned. (*Id.*) Williams did not file a charge of discrimination with the EEOC.

### III. MOTION FOR SANCTIONS

Plaintiffs' motion for sanctions is based upon: (1) RTM's alleged failure to provide plaintiffs a copy of a "complete" personnel file for former defendant Tracey Butler; (2) RTM's alleged failure to permit its corporate representative to be deposed beyond January 26, 1998; (3) RTM's alleged failure "to have available the person(s) necessary to complete the deposition in the areas noticed by Plaintiffs"; and, (4) RTM's alleged failure to produce requested documents at the deposition of its corporate representative. (Motion for sanctions at 1-2.) Upon making the following findings with regard to those allegations, the court holds that this motion is due to be denied.

### A.    Failure To Provide "Complete" Personnel File Of Tracey Butler

Plaintiffs claim they were not provided the "complete" personnel file of Tracey Butler, because one document allegedly was omitted therefrom. RTM's corporate representative, Adam George, testified that a "personnel status form" relating to discipline

11

taken against Butler should have been placed in his personnel file, but was not. George further testified there was a "possibility that [the form] never made it to [Butler's] file, because shortly after this was filled out, Tracy was no longer with our company." (George deposition at 165.)

## B. Failure To Permit Deposition Beyond January 26, 1998

This court's October 21, 1997 scheduling order required that discovery be completed by February 3, 1998. Plaintiffs' counsel represents that she reached an informal agreement with defense counsel to permit discovery beyond that date. She now contends that she was not given an opportunity to continue the deposition of RTM's corporate representative, which concluded on January 26, 1998. This court simply notes that its orders, not alleged side agreements among counsel, control all proceedings in these actions.

## C. Failure To Make Available Necessary Witness

Plaintiffs claim "Defendant failed to have available the person(s) necessary to complete the deposition in the areas noticed by Plaintiffs." (Motion for sanctions at 2.) Plaintiffs do not identify the "areas noticed" to which Adam George failed to testify, but present this court with a portion of deposition testimony in which he admits he cannot testify that plaintiffs' copies of particular personnel files are "complete." (*Id.* exhibit C.)

12

## D. Failure To Produce Requested Documents

Plaintiffs finally contend that RTM should be sanctioned for failure to produce requested documents at the deposition of its corporate representative. RTM responds that it supplied the requested documents prior to the deposition in response to a request for production. Moreover, when plaintiffs' counsel raised the issue during the deposition, RTM offered to make the original documents available. Plaintiffs' counsel canceled two subsequent appointments to inspect the files.

### IV. MOTIONS FOR SUMMARY JUDGMENT

## A. Title VII and § 1981 Analysis

Plaintiff Williams failed to file a charge of discrimination with the EEOC. Therefore, all claims Williams asserts under Title VII are due to be dismissed. Williams brings the same actions under 42 U.S.C. § 1981, however. In the Eleventh Circuit, "[w]hen § 1981 is used as a basis for relief parallel to that provided by Title VII, the elements of a § 1981 claim are identical to the elements of a Title VII claim." *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980); *accord Walters v. City of Atlanta*, 803 F.2d 1135, 1143 (11th Cir. 1986). The court will analyze plaintiffs' claims accordingly.

Anthony Long and Ezell Williams bear the burden of proving by a preponderance of the evidence that RTM intentionally discriminated against them because of their race. That can be done

13

either by direct or circumstantial evidence. Plaintiffs offer no direct evidence of a discriminatory animus, however. For cases such as the instant case, therefore, where the evidence of intent is circumstantial in nature, the Supreme Court has prescribed an analytical process to evaluate the strength of plaintiff's proof.

In three decisions rendered over two decades, the Supreme Court "developed a formula for shifting evidentiary burdens between plaintiff and defendant which permits the establishment of intentional discrimination without direct evidence of unlawful motivation." A.C. Modjeska, *Employment Discrimination Law* § 1:09, at 39-40 (3d ed. 1996). The order and allocation of burdens of proof, persuasion, and production were first defined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), then elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and finally elucidated in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The analytical structure developed by that trilogy of decisions has three steps, the ultimate goal of which is that of "progressively ... sharpen[ing] the inquiry into the elusive factual question of intentional discrimination." *St. Mary's Honor Center*, 509 U.S. at 506, 113 S.Ct. at 2746 (quoting *Burdine*, 450 U.S. at 255 n.8, 101 S.Ct. at 1094 n.8).[6]

---

[6] Plaintiffs, either disingenuously or ignorantly (but nonetheless unpersuasively), argue that the *McDonnell Douglas* "framework is properly to be

14

The first step is satisfied when the plaintiff establishes a *prima facie* case. At the second stage of analysis, the burden of production shifts to defendant to rebut the presumption of intentional discrimination raised by plaintiffs' demonstration of a *prima facie* case. A defendant may do so by articulating legitimate, nondiscriminatory reasons for the contested employment action. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

If defendant presents such evidence, then in the final step of the inquiry, plaintiffs must show by a preponderance of the evidence that defendant's stated reasons are mere pretexts for unlawful, discriminatory motives. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

**B. Anthony Long**

**1. Wage discrimination**

**a. *Prima facie* case**

To present a *prima facie* case of race-based wage discrimination, plaintiffs must demonstrate that they were "paid less than a member of a different race was paid for work requiring substantially the same responsibility." *Pittman v. Hattiesburg Municipal School District*, 644 F.2d 1071, 1074 (5th Cir. 1981).[7] "To make a comparison of plaintiff's treatment to that of non-

---

considered at trial, <u>not</u> at this [summary judgment] stage of the proceedings." (Plaintiffs' brief at 14 (emphasis in original).)

[7] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

15

minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

Anthony Long was promoted to the position of assistant manager on June 18, 1994, and concomitantly awarded an annual salary of $20,000. That salary was raised to $21,500 a year later, on May 29, 1995. Even so, Long claims he was paid less than the following, white assistant managers:

1. Gary Steelman - hired in June of 1995 at a salary of $32,000.

2. Angie Edmiston - hired in October of 1994 at a salary of $25,000.

3. Clifford Myers - hired in October of 1994 at a salary of $23,000.

4. Jill Byrne - hired in December of 1994 at a salary of $24,000.

5. Randy Hough - hired in 1995 at a salary of $25,000.

6. Don C. Groves - hired in April of 1994 at a salary of $25,000.

7. Kenneth Moore - hired in February of 1993 at a salary of $23,000.

RTM does not dispute that the foregoing assistant managers were paid more than Long. The court finds the evidence sufficient to establish a *prima facie* case.

16

### b. RTM's articulated reasons for wage disparity

RTM utilizes the affidavit testimony of Sharron Barton, its

Senior Vice President, to present nondiscriminatory reasons for the

difference in pay with the foregoing comparators:

> 7. Any pay differential between Anthony Long and other
> assistant managers was based on their relative education,
> work experience[,] and experience in fast food
> management[,] and was in no way based upon race.
>
> . . .
>
> 9. In determining salary increases for assistant
> managers and managerial employees such as Anthony Long,
> the director of operations or vice president of
> operations will make a recommendation regarding a salary
> increase. These recommendations are based upon the
> specific individual's performance, as well as the store's
> performance. I then review salary recommendations in
> terms of these factors, as well as the position for which
> the person was hired, their RTM salary history, years of
> service[,] and years in position before I approve raises.
> At no time did I base a compensation decision for Anthony
> Long on his race.

(Barton affidavit ¶¶ 7, 9.)

Anthony Long does not direct this court to any evidence of his

education, experience, and performance reviews, or the education,

experience, and performance reviews of his comparators.[8]

--------

[8] Long does make the following conclusory statements about the
qualifications of certain assistant managers:

1. Gary Steelman possessed "no prior fast-food experience."

2. Angie Edmiston's "prior work experience appears to be as a
   bank teller."

3. Clifford Myers possessed "approximately only 2 years' prior
   restaurant experience."

4. Jill Byrne worked as an RTM cashier for two years, then as a
   bank teller and secretary, before becoming an assistant
   manager. [Footnote continues on following page.]

17

Apparently, Long would like this court to wade through the eight folders of evidentiary materials and five volumes of pleadings and motions which collectively comprise the record, to determine respective qualifications. This court is not obligated to search the entire record for a genuine issue of material fact, however. Rather, the party opposing summary judgment must direct the court's attention to evidence which demonstrates the existence of triable issues. *See e.g., Barge v. Anheuser-Busch, Inc.,* 87 F.3d 256, 259 (8th Cir. 1996) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim"); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact"); *Frito-Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C. Cir. 1988) (Appellant's failure to designate and reference triable facts was, in light of the language of Rule 56(c) and governing precedent, fatal to its opposition"); *Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec,* 854 F.2d 1538, 1545 (9th Cir. 1988) (noting that an opposition brief which failed to identify and reference triable facts was insufficient to preclude grant of properly supported summary judgment motion);

---

(Plaintiffs' brief at 11.)   However, he does not direct this court to specific portions of the record allegedly supporting those assertions.

18

*Nissho-Iwai American Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988) (rejecting notion that "the entire record must be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered").

This court thus finds that Anthony Long has failed to demonstrate a genuine issue of material fact regarding RTM's articulated reasons for its salary decisions, and summary judgment is appropriate on his wage discrimination claim.

### 2. Promotion discrimination

> To establish a *prima facie* case of discrimination in promotion, a plaintiff must prove: (1) he or she is a member of a protected minority; (2) was qualified for and applied for the promotion; (3) was rejected despite these qualifications; and (4) other equally or less qualified employees who were not members of the protected minority were promoted.

*Wu v. Thomas*, 847 F.2d 1480, 1483 (11th Cir. 1988).

RTM argues that Anthony Long cannot demonstrate he was denied a managerial position, or that equally or less-qualified persons outside the protected class were promoted. Long provides no coherent response to RTM's argument. In fact, Long's brief appears to limit argument to his claims for "salary disparity." (Plaintiffs' brief at 13.)

The evidence demonstrates that Long was promoted from "team leader" to assistant manager within two months of his return to employment with RTM in May of 1994. He identifies no promotions that he allegedly should have received in that two month time

19

period. Accordingly, this court finds that summary judgment is appropriate on his promotion discrimination claims.

## 3.    Hostile Work Environment

In paragraph eleven of Long's complaint, he alleges that "Defendant Butler has exhibited a pattern of racial discrimination creating a racially hostile work environment from which Plaintiff suffered." A hostile work environment claim lies against the employer, not the individual employee. *See, e.g., Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991). Therefore, although the court dismissed all federal claims against defendant Butler individually (*see* the Order entered June, 17, 1997, Doc. No. 79), the court recognizes these Title VII and § 1981 claims as claims against the employer, defendant RTM.

RTM requests summary judgment on all claims, yet fails to specifically address the hostile work environment claims. RTM, therefore, has not met its initial burden of demonstrating that no issue of material fact exists for these claims. *See, e.g., Celetox Corp.*, 477 U.S. 317, 106 S.Ct. 2548. Thus, the court finds summary judgment inappropriate as to this issue. The court advises the parties to consider the Supreme Court's recent decisions concerning this area of the law before presenting argument on this claim.

20

## C.  Ezell Williams

### 1.  Hostile work environment

Williams' hostile work environment claim is derived almost completely from the following actions of his training manager, Steve Middlebrooks:

1.  Middlebrooks grabbed him by the arm and chastised him for performing paperwork during "dinner rush," but failed to reprimand a white assistant manager who was eating at the same time.  (Williams deposition at 121-25.)

2.  Middlebrooks called him "Bubba" on one occasion, and "Brother" on another.

3.  Middlebrooks required Williams to work without sufficient numbers of supporting employees, and with employees who were undertrained.

4.  Middlebrooks did not reprimand white employee Angie Edmiston for failing to complete assigned tasks.

5.  Middlebrooks did not require Angie Edmiston to perform extra duties when she closed the store.

6.  Middlebrooks required Ezell Williams to clean bathrooms in the midst of a "rush" of patrons, but he did not observe white employees with similar duties.

7.  Middlebrooks falsified Williams' evaluations.  (*Id.* at 456.)

In addition to Middlebrooks' conduct, Ezell Williams points to one other incident that allegedly created a hostile working environment.  Shelly Rader allegedly chastised Williams on one occasion for leaving work to assist a family member with automobile troubles, but did not question Jeff Calvert, a white employee who left work for a longer period of time on a different occasion.[9]

_____
[9] Plaintiffs' counsel characterizes Rader's conduct on that occasion as retaliatory.  (Plaintiffs' brief at 7, ¶ 14.)  Even so, Williams subjectively

21

The elements of a *prima facie* case for a racially hostile work environment are: (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based upon the employee's race; and (4) the harassment complained of affected a "term, condition, or privilege" of employment, in that it was "sufficiently severe or pervasive to alter the condition of [the victim's] employment and create an abusive working environment." *See Henson v. Dundee*, 682 F.2d 897, 903-05 (11th Cir.1982)(sexual harassment); *see also Bivins v. Jeffers Vet Supply*, 873 F. Supp. 1500, 1507 (M.D. Ala. 1994)(race).

The court recognizes what used to be the fifth element of a *prima facie* case, establishing the employer's liability under the doctrine of *respondeat superior*, *see, e.g., Bivins*, 873 F. Supp. at 1507, has been altered by the Supreme Court in the recent decisions of *Faragher v. City of Boca Raton*, ___ U.S. ___, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and *Burlington Industries, Inc. v. Ellerth*, ___ U.S. ___, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Although those cases addressed sexual harassment claims, the court finds that the logic of the decisions applies "with equal force" to claims of harassment based on race. *Wright-Simmons v. City of Oklahoma City*, No. 96-6203, 1998 WL 614414, at *7 (10th Cir. 1998); *see also*

perceived Rader's actions to be based on race. (Williams deposition at 224.)

22

*Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 1998 WL 654810, at
*12 (5th Cir. 1998).

The Supreme Court extensively analyzed the vicarious liability
of employers for harassment by supervisory employees. In *Faragher*,
the Court, adopting the holding in *Burlington Industries*, held that
"[a]n employer is subject to vicarious liability to a victimized
employee for an actionable hostile environment created by a
supervisor with immediate (or successively higher) authority over
the employee." 118 S.Ct. at 2292-93.

Although the Court apparently eliminated the liability element
of a *prima facie* case, it also granted employers an affirmative
defense to this vicarious liability which they can raise when no
tangible employment action has been taken.

> The defense comprises two necessary elements: (a) that
> the employer exercised reasonable care to prevent and
> correct promptly any sexually harassing behavior, and (b)
> that the plaintiff employee unreasonably failed to take
> advantage of any preventive or corrective opportunities
> provided by the employer or to avoid harm otherwise.

*Id.* at 2293. The Court based the affirmative defense on the

following rationale:

> If the plaintiff unreasonably failed to avail herself of
> the employer's preventive or remedial apparatus, she
> should not recover damages that could have been avoided
> if she had done so. If the victim could have avoided
> harm, no liability should be found against the employer
> who had taken reasonable care, and if damages could
> reasonably have been mitigated no award against a liable
> employer should reward a plaintiff for what her own
> efforts could have avoided.

*Id.* at 2292.

23

This court finds that Williams has established the first two elements of a *prima facie* case. The court also finds genuine issues of material fact exist as to the third and fourth elements. Moreover, the court finds that defendant has presented evidence that may allow it to avail itself of the affirmative defense the Supreme Court recognized in *Faragher*. This court will entertain such argument by defendant. For the foregoing reasons, defendant's motion is due to be denied with respect to Williams' hostile work environment claim.

## 2. Constructive discharge

The Eleventh Circuit "has traditionally required a high degree of deterioration in an employee's working conditions" before finding a constructive discharge. *Hill v. Winn-Dixie Stores, Inc.*, 934, F.2d 1518, 1527 (11th Cir. 1991). Thus, a plaintiff seeking to prove constructive discharge must demonstrate working conditions were so intolerable that a reasonable person in the same position would feel compelled to resign. *Kilgore v. Thompson & Brock Management*, 93 F.3d 752, 754 (11th Cir. 1996).

RTM's actions did not force Williams' constructive discharge. A reasonable person in Williams' situation would not have found the working conditions "intolerable," or resigned from employment. *See, e.g., Goldsmith v. Mayor and City Council of Baltimore*, 987 F.2d 1064, 1072 (4th Cir. 1992)("[I]solated incidents involving raised voices and flaring tempers ... simply do not rise to the

24

level" of a constructive discharge); *Bose v. Branstetter*, 912 F.2d 801, 804-06)(5th Cir. 1990)(unwarranted criticism, probation, and poor performance evaluation did not amount to constructive discharge); *Stetson v. Nynex Service Co.*, 995 F.2d 355, 360-61 (2d Cir. 1993)(undue criticism and poor performance evaluation not sufficient to establish constructive discharge).

This court cannot find that a reasonable person would resign from employment based upon the single act of criticism that Rader directed towards Williams.[10] Accordingly, summary judgment is appropriate on the constructive discharge claim.

### 3. Retaliation

To establish a *prima facie* case of retaliation, Williams must demonstrate: (1) statutorily protected expression; (2) an adverse employment action; and (3) a causal linkage between the first two elements. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). The court finds that Williams cannot demonstrate he suffered an adverse employment action.

RTM argues that its treatment of Williams cannot be considered an "adverse employment action," and relies principally upon the Fifth Circuit's opinion in *Mattern v. Eastman Kodak*, 104 F.3d 702 (5th Cir. 1997). The *Mattern* court held that only "ultimate

---

[10] Williams' complaint is based on several other actions taken by RTM supervisors after Middlebrooks was disciplined. Even so, Williams testified that those actions were taken in retaliation for his complaints about Middlebrooks, not because of his race. (*See* Williams deposition at 310, 332, 338, 414, 554-56, 620.)

25

employment decisions," such as hiring and firing, could constitute
adverse employment actions. *Id.* at 708.

The Eleventh Circuit recently rejected the *Mattern* analysis,
however, and held that "Title VII's protection against retaliatory
discrimination extends to adverse actions which fall short of
ultimate employment decisions." *Wideman v. Wal-Mart Stores, Inc.*,
141 F.3d 1453, 1456 (11th Cir. 1998). Even so, the *Wideman* court
also recognized "that there is some threshold level of
substantiality that must be met for unlawful discrimination to be
cognizable under the anti-retaliation clause," but declined to
determine "the exact notch into which the bar should be placed."
*Id.*

Thus, the remaining issue is whether RTM's conduct surpasses
the "threshold level of substantiality that must be met for
unlawful discrimination to be cognizable under the anti-retaliation
clause ...." *Wideman*, 141 F.3d at 1456. In *Wideman*, the various
managers: (1) listed the plaintiff absent on a day she was
scheduled to be off from work; (2) required the plaintiff to work,
even though she was not scheduled to do so; (3) gave her two
unwarranted written reprimands, resulting in a one day suspension
from work; (4) refused plaintiff timely medical treatment for a
work-related injury; (5) solicited negative comments about the
plaintiff from co-workers; and, (6) threatened to shoot the
plaintiff in the head. It should come as no great shock that the

26

*Wideman* court found such conduct sufficiently adverse, but the
court nevertheless expressly declined to establish any specific
standards for determining adversity.

Even so, another panel of the Eleventh Circuit issued an
opinion after *Wideman*,[11] and that panel adopted an objective test
to determine if a particular employment action is "adverse." *See*
*Doe v. Dekalb County School District*, No. 97-8915, 1998 WL 399681
(11th Cir. July 17, 1998).[12]  A plaintiff demonstrates an "adverse
employment action" only if "a reasonable person in his position
would view the employment action as adverse." *Id.* at *6.
Moreover, "[a]ny adversity must be material; it is not enough that
[the employer's action] imposes some *de minimis* inconvenience or
alteration of responsibilities. *Id.* at *11.  "[N]ot everything
that makes an employee unhappy is an actionable adverse action."
*Id.* at *7 (quoting *Smart v. Ball State University*, 89 F.3d 437, 441
(7th Cir. 1996).

Williams has demonstrated nothing more than his unhappiness
with certain actions taken by RTM's agents in the months following

---

[11] The panel in *Wideman* was comprised of Circuit Judge Carnes, Senior
Circuit Judge Kravitch, and Senior District Judge Mills, sitting by designation.
Circuit Judges Anderson and Birch, as well as Senior District Judge Paine,
sitting by designation, comprised the panel in Doe v. Dekalb Co. School District.

[12] The court in *Dekalb County School District* was asked to interpret that
portion of a *prima facie* case under the Americans with Disabilities Act which
requires proof of an "adverse employment action." Even so, the court did not
limit itself to a discussion of the ADA, or to pure discrimination (as opposed
to retaliation) cases. Instead, the court relied upon retaliation cases and
other cases decided under Title VII, and was "hesitant to introduce unnecessary
inconsistency and confusion into employment discrimination law." Doe v. Dekalb
County School District, No. 97-8915, 1998 WL 399681 at *8 (11th Cir. July 17,
1998).

27

his complaints about Middlebrooks. This court cannot find that a
reasonable person in Williams' position would view RTM's actions as
adverse. Williams' has presented absolutely no evidence that his
employment was materially affected in any way. Accordingly, this
court determines that Ezell Williams did not suffer an adverse
employment action, and summary judgment accordingly is appropriate
on his retaliation claim.

### 4.  Wage discrimination

Ezell Williams' claim of wage discrimination must fail for the
same reason as that of Anthony Long: he fails to direct this court
to any evidence of his education, experience, and performance
reviews, or the education, experience, and performance reviews of
employees who allegedly received higher salaries.

### 5.  Failure to hire

Williams' discriminatory failure to hire claim is based upon
the following argument:

> Plaintiff Williams, a black male, applied for a
> position but was informed he did not qualify and that RTM
> was not actually hiring. Shortly thereafter Mr. Gary
> Steelman, a white male, was hired for the same position
> at a starting salary of $32,000. Mr Steelman had no
> prior <u>fast-food</u> experience.

(Plaintiffs' brief at 10 (emphasis in original).)

### a.  Prima facie case

Williams has produced nothing more than the bare statement
above to compare his qualifications with those of Gary Steelman.
Although a finding that Williams and Steelman were "similarly

28

situated in all relevant respects," *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997), is hardly supported, the court need not rely on the apparent failure to establish this element of the *prima facie* case in granting summary judgment on this claim.

    b.    **Articulated nondiscriminatory reasons**

    Summary judgment also is appropriate, because Williams fails to rebut RTM's articulated reasons for hiring Gary Steelman.    RTM establishes that Steelman was hired in connection with RTM's "fast track" program.    (George affidavit ¶ 15.)    A prerequisite to entering that program was "multi-unit management experience." (*Id.*)  Steelman "did not previously have 'fast-food' experience, but he had significant previous managerial experience over a multi-unit sales operation."  (*Id.*)   Williams possessed no such experience. (*Id.*)

    Williams may rebut RTM's articulated reasons for hiring Gary Steelman by coming forward "with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment    decision."    *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).    Williams has presented no such evidence, and summary judgment accordingly is appropriate.

29

## V. CONCLUSION

For the foregoing reasons, this court concludes RTM's motions for summary judgment against Anthony Long and Ezell Williams are due to be granted on all claims except for Long's Title VII and § 1981 hostile work environment claims, and Williams' § 1981 hostile work environment claim. Plaintiffs' motion for sanctions is due to be denied. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this the _13th_ day of October, 1998.

United States District Judge

30